## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **HERMAN C. BERKEL,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION FILE NO.** |
| | : | **1:12-CV-03558-AJB** |
| **CAROLYN W. COLVIN,** | : | |
| ***Acting Commissioner of*** | : | |
| ***Social Security***, | : | |
| | : | |
| **Defendant.** | : | |

## ORDER AND OPINION[1]

Plaintiff Herman C. Berkel ("Plaintiff") brought this action pursuant to sections 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), to obtain judicial review of the final decision of the Commissioner of the Social Security Administration ("the Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income Benefits

---

[1]     The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.  [*See* Dkt. Entries dated Nov. 26, 2012].  Therefore, this Order constitutes a final Order of the Court.

("SSI") under the Social Security Act.[2]   For the reasons below, the undersigned

**AFFIRMS** the final decision of the Commissioner.

## I.      PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI on February 19, 2009, alleging

disability commencing on March 1, 2007. [Record (hereinafter "R") 19, 72-74, 132-44;

Doc. 11 at 2; Doc. 12 at 2].  Plaintiff's applications were denied initially and on

reconsideration.   [*See* R72-74].   Plaintiff then requested a hearing before an

Administrative Law Judge ("ALJ").  [R89-97].  An evidentiary hearing was held on

March 9, 2011.  [R32-71].  The ALJ issued a decision on May 12, 2011, denying

Plaintiff's application on the ground that he had not been under a "disability" at any

---

[2]       Title II of the Social Security Act provides for federal Disability Insurance Benefits.   42 U.S.C. § 401 *et seq*.   Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq*., provides for Supplemental Security Income Benefits for the disabled.  Title XVI claims are not tied to the attainment of a particular period of insurance disability.  *Baxter v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982). Otherwise, the relevant law and regulations governing the determination of disability under a claim for DIB are nearly identical to those governing the determination under a claim for SSI. *Wind v. Barnhart*, 133 Fed. Appx. 684, 690 n.4 (11th Cir. June 2, 2005) (citing *McDaniel v. Bowen*, 800 F.2d 1026, 1031 n.4 (11th Cir. 1986)).   In general, the legal standards to be applied are the same regardless of whether a claimant seeks DIB, to establish a "period of disability," or to recover SSI, although different statutes and regulations apply to each type of claim. *See* 42 U.S.C. § 1383(c)(3) (establishing that the judicial provisions of 42 U.S.C. § 405(g) are fully applicable to claims for SSI). Therefore, to the extent that the Court cites to SSI cases, statutes, or regulations, they are equally applicable to Plaintiff's DIB claims, and vice versa.

AO 72A
(Rev.8/8
2)

time through the date of the decision. [R16-31]. Plaintiff sought review by the Appeals Council, and the Appeals Council denied Plaintiff's request for review on August 14, 2012, making the ALJ's decision the final decision of the Commissioner. [R1-7].

Plaintiff then filed an action in this Court on October 12, 2012, seeking review of the Commissioner's decision. [*See* Docs. 1, 3]. The answer and transcript were filed on February 13, 2013. [*See* Docs. 7, 8]. On March 25, 2013, Plaintiff filed a brief in support of his petition for review of the Commissioner's decision. [Doc. 11]. On April 24, 2013, the Commissioner filed a response in support of the ALJ's decision. [Doc. 12].[3] The matter is now before the Court upon the administrative record, the parties' pleadings, and the parties' briefs, and it is accordingly ripe for review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

---

[3] Plaintiff did not file a reply brief, [*see* Dkt.], and because Plaintiff's counsel failed to appear for oral argument and did not request that the hearing be rescheduled, no oral argument took place, [*see* Doc. 13].

## II.    STATEMENT OF FACTS[4]

### A.    Administrative Records

Plaintiff was born on March 15, 1960.  [R132, 139].  Plaintiff had worked as a roofer, but he alleged that he had become disabled as of March 1, 2007, due to high blood pressure, leg pain, and blurred vision.  [R163-64].

### B.    Plaintiff's Testimony

Plaintiff was almost fifty-one years old at the time of the hearing before the ALJ. [R37].  He has an eleventh-grade education and worked as a roofer for more than twenty years—from 1986 until March 2007. [R38].  At the time of the hearing, he lived in a homeless shelter.  [R36].

Plaintiff stated before the ALJ that the only impairments that limit his ability to work were his hypertension, leg pain, and blurred vision.  [R38-39].  Plaintiff testified that he was able to care for an elderly individual, doing such things as cleaning his house, cooking, and accompanying him to dialysis appointments.  [R 47-51].  Plaintiff also testified that he was able to use public transportation.  [R51].

_____

[4]      The records referenced in this section are generally limited to those deemed by the parties to be relevant to this appeal.  [*See* Docs. 11, 12].

4

### C.    Medical Records

On August 28, 2006, Plaintiff had a follow-up outpatient visit at the Grady Health System. [R230, 269]. He was diagnosed with uncontrolled hypertension, and it was noted that he was not compliant with medication. [R230, 269]. Plaintiff reported that he was able to walk ten miles per day. [R230, 269]. He was prescribed lisinopril,[5] and it was noted that he was counseled for smoking but was not ready to quit. [R231, 270].

On December 5, 2006, Plaintiff received outpatient treatment from the Grady Health System for stomach pain. [R249]. It was noted that Plaintiff had been prescribed lisinopril for blood pressure but that he was only intermittently compliant. [R249]. It was also noted that Plaintiff smoked approximately one pack of cigarettes daily and used marijuana on weekends. [R249]. His lisinopril dosage was increased,

---

[5]    Lisinopril is used to treat high blood pressure. It works by decreasing certain chemicals that tighten the blood vessels, so blood flows more smoothly and the heart can pump blood more efficiently. MedlinePlus, Lisinopril, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692051.html (last visited 2/14/14).

5

and he was also prescribed HCTZ,[6] scheduled for an eye appointment, and counseled on quitting smoking.  [R250].

On December 12, 2006, Plaintiff was seen at the Grady Eye Clinic.  [R251].  He reported that he had difficulty seeing at night.  [R251].  He was diagnosed with optic atrophy[7] and possible glaucoma.[8]  [R251].  It was also noted that he was hypertensive. [R251].

On January 2, 2007, Plaintiff was again seen at the Grady Eye Clinic.  [R268]. He was diagnosed with optic atrophy.  [R268]

_____

[6]    "HCTZ" is an abbreviation for the diuretic hydrochlorothiazide. *See* MediLexicon Medical Abbreviations, http://www.medilexicon.com/medicalabbreviations.php?keywords=hctz&search=abbreviation (last visited 2/14/14).  Hydrochlorothiazide is a "water pill," and is used to treat high blood pressure and fluid retention caused by various conditions, including heart disease.  It causes the kidneys to get rid of unneeded water and salt from the body into the urine. *See* MedlinePlus, Hydrochlorothiazide, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682571.html (last visited 2/14/14).

[7]    "Atrophy" refers to a wasting of tissues or organs. *PDR Med. Dictionary* 165 (1st ed. 1995).

[8]    Glaucoma is a disease of the eye characterized by increased pressure inside the eye, excavation, and atrophy of the optic nerve.  It produces defects in the field of vision. *PDR Med. Dictionary* 723 (1st ed. 1995).

6

On February 21, 2007, Plaintiff had a follow-up visit at Grady upon referral from the eye clinic. [R266]. He reported having been out of medication for one year. [R266]. It was noted that he was non-compliant with treatment for hypertension, smoked a pack of cigarettes each day, and used marijuana. [R266]. The clinic offered to refill his hypertension medication and recommended follow-up tobacco abuse counseling. [R267]. He also underwent an MRI of the head, which indicated mild chronic microangiopathic[9] change in the periventricular white matter[10] and normal orbits.[11] [R236].

On March 14, 2007, Plaintiff was treated at the Grady Health System emergency room for a sore throat, cough, and "flu like symptoms." [R262-64]. Plaintiff reported that he had head, back, and chest pain and that he was not taking any medication,

———————————

[9]    "Microangiopathy" refers to any disease of the capillaries. *PDR Med. Dictionary* 271, 1110 (1st ed. 1995).

[10]    Periventricular white matter is white matter that is immediately to the side of the two lateral ventricles of the brain. White matter is a group of white nerve fibers that conduct nerve impulses quickly and is important for muscle movement. M e d F r i e n d l y ,   P e r i v e n t r i c u l a r   W h i t e   M a t t e r , http://www.medfriendly.com/periventricularwhitematter.html (last visited 2/19/14).

[11]    "Orbit" is another word for the eye socket. *PDR Med. Dictionary* 1256 (1st ed. 1995).

despite his history of hypertension.  [R262, 264].   He reported smoking one to two packs of cigarettes per day.  [R264].

On June 26, 2007, Plaintiff returned to the Grady Eye Clinic with optic atrophy and retinopathy[12] related to hypertension.  [R248].  His eyes were runny, but he denied any change in vision.  [R248].  It was noted that Plaintiff had stopped taking his blood pressure medication.  [R248].  Clinic personnel recommended that Plaintiff restart therapy for his hypertension and discussed the importance of the therapy with him. [R248].

On July 11, 2007, Plaintiff presented at Grady for an outpatient visit.  [R246]. He did not want to give his medical history and refused examination.  [R246]. Although clinic personnel explained to him the importance of treating his elevated blood pressure, he refused treatment and walked out of the clinic against the physician's recommendation.  [R247].

September 2007 treatment notes from the Grady Eye Clinic indicate that Plaintiff had good acuity, and "gets around ok [without] glasses" but that he alleged problems

---

[12]       Retinopathy is noninflammatory degenerative disease of the retina. *PDR Med. Dictionary* 1538-39 (1st ed. 1995).

8

adjusting from light to dark environments.  [R245].  He was noted to be hypertensive.  [R245].

On December 24, 2007, Plaintiff returned to the Grady Emergency Care Center with complaints of eye pain and night blindness.  [R252-55].  He had what appeared to be a stye[13] in his right eye.  [R254-55].  He was given eye drops and was also noted to be hypertensive.  [R253].  He requested blood pressure medication.  [R253].

On March 8, 2008, Plaintiff was again seen at the Grady Eye Clinic.  [R242].  He was diagnosed with optic neuropathy[14] and uncontrolled hypertension due to non-compliance with blood-pressure medication.  [R242].

On January 14, 2009, Plaintiff returned to Grady with elevated blood pressure, cold symptoms, and complaints of "constant" full body aches, but he reported no eye pain or vision change.  [R238, 240].  He was diagnosed with a viral illness.  [R241].

On February 11, 2009, Plaintiff was again seen at Grady's emergency room.  [R256].  He complained of sore throat, cough, abdominal pain, fatigue, and myalgia,[15]

---

[13]     A stye is an inflamed opening into the follicle of an eyelash.  *PDR Med. Dictionary* 722, 1691 (1st ed. 1995).

[14]     "Neuropathy" is "[a] classical term for any disorder affecting any segment of the nervous system."  *PDR Med. Dictionary* 1204 (1st ed. 1995).

[15]     Myalgia is muscle pain.  *PDR Med. Dictionary* 1161.  (1st ed. 1995).

AO 72A
(Rev.8/8
2)

but reported no vision change or blurry vision, and he admitted that he had stopped taking medication for his hypertension one year prior. [R256]. He reported smoking a pack of cigarettes per day, and it was also noted that he was living in a shelter. [R256]. The next day, Plaintiff was treated at the emergency room of DeKalb Medical Center for chest pain. [R212-19]. Treatment notes indicate that Plaintiff's chest x-ray was normal, his eyes were normal, he was alert and oriented, and he suffered from hypertension. [R213, 218-21].

On March 26, 2009, Plaintiff was seen for follow-up regarding his claims of right-leg pain. [R243]. It was noted that Plaintiff's hypertension was controlled, and he was advised to continue to take medication. [R244]. His lower-extremity pain was determined to probably be musculoskeletal, and he was advised to take Tylenol for it. [R244].

On June 2, 2009, Plaintiff was seen at Grady's Primary Care Center. [R333]. He reported blurry vision without pain. [R333]. It was noted that Plaintiff's hypertension was controlled with medication. [R333-34].

On May 15, 2009, Plaintiff was seen by Cherrell Thomas, LAPC, at the DeKalb County Community Service Board ("DeKalb County"). [R271-84]. Presenting problems were moderate, chronic anxiety, evidenced by agitation, excessive worry, and

10

restlessness; moderate depression of a duration of between thirty days and six months, evidenced by appetite disturbance, hypersomnia, tearfulness, sadness, and decreased energy; and moderate, chronic substance abuse, evidenced by blackouts, physical issues, and emotional issues. [R271]. It was noted that Plaintiff was anxious about his homelessness, finances, and health, and that he had used marijuana since he was thirteen years old and had used crack and cocaine since 1987. [R271]. It was also noted that Plaintiff was "vague" about his depressive symptoms and that he reported having quit drinking ten years prior but continued to abuse crack and marijuana. [R280]. Ms. Thomas opined that Plaintiff suffered from substance abuse and depressive disorder and assigned him a Global Assessment Functioning ("GAF") score of 40.[16] [R278].

_____

[16]     The Global Assessment of Functioning ("GAF") is a numeric scale (0 through 100) that considers psychological, social, and occupational functioning on a hypothetical continuum of mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 32-34 (4th ed., Text Revision, 2000) ("DSM-IV-TR"). A GAF score between 31 and 40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." *Id.* at 34.

AO 72A
(Rev.8/8
2)

On June 10, 2009, Plaintiff was seen by Ken Sanford, M.D., a consultative examiner. [R287-93]. Chief complaints were hypertension, vision condition, and leg pain. [R287]. Dr. Sanford noted that Plaintiff complained of right-leg pain but reported that he had no difficulties walking and that walking relieved his pain. [R287]. Plaintiff reported taking several medications: lisinopril 40 mg, amlodipine 10 mg,[17] ranitidine 150 mg,[18] HCTZ 25 mg, and naproxen 250 mg.[19] [R287]. Plaintiff was 5'8" and weighed 256 pounds. [R288]. His pupils were equal and reactive to light, his ocular motion was equal, and his mental state was normal. [R288-89]. Diagnoses were hypertension uncontrolled, GERD, obesity, visual disturbance, tobacco abuse, and back

---

[17]    Amlodipine is a calcium channel blocker that is used alone or in combination with other medications to treat high blood pressure and chest pain. *See* MedlinePlus, *Amlodipine*, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692044.html (last visited 2/14/14).

[18]    Ranitidine is used to treat ulcers; gastroesophageal reflux disease ("GERD"), a condition in which backward flow of acid from the stomach causes heartburn and injury of the food pipe (esophagus); and conditions where the stomach produces too much acid. *See* MedlinePlus, *Ranitidine*, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601106.html (last visited 2/14/14).

[19]    Naproxen is used to relieve pain, tenderness, swelling, and stiffness. *See* MedlinePlus, *Naproxen*, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681029.html (last visited 2/14/14).

12

AO 72A
(Rev.8/8
2)

pain.  [R289].  Dr. Sanford further stated that uncontrolled hypertension and obesity increased Plaintiff's risk for a cardiovascular event and that Plaintiff complained of back pain which may be due to degenerative disorder as well as obesity.  [R289]. Dr. Sanford also noted that Plaintiff "is very vague with his history," and he observed a normal range of motion and strength in all available categories.  [R289-92].

On July 6, 2009, non-examining state agency physician R. Paul Crank, Jr., M.D., opined that Plaintiff could lift or carry fifty pounds occasionally and twenty-five pounds frequently; could sit, stand, or walk for six hours in an eight-hour workday; and was unlimited in his push/pull ability.  [R295].  Dr. Crank found no postural, manipulative, visual, communicative, or environmental limitations.  [R296-98].

On July 17, 2009, Plaintiff returned to Grady for a blood pressure check.  [R329]. He also alleged back pain and leg pain with walking.  [R329].  His blood pressure was elevated due to his failure to comply with prescribed medication.  [R329-30].  Two weeks later, on July 30, 2009, Plaintiff's hypertension was controlled with medication. [R326].

On August 4, 2009, Plaintiff presented at Grady's Ophthalmology Clinic with complaints of blurry vision and intermittent eye pain.  [R327].

13

In October 2009, Plaintiff was seen by Grady's emergency department for high blood pressure.  [R303].  He also alleged back pain that was worse with walking and improved with rest.  [R308, 316-17].  At a follow-up exam later that month, Plaintiff reported having no pain, and a straight-leg-raise test was negative.  [R366-67].  A lumbosacral spine series dated November 5, 2009, revealed "minimal loss of the normal lumbar lordosis,"[20] scattered anterior osteophytes,[21] and minimal degenerative disc disease of the lumbosacral spine.  [R340].

On February 11, 2010, Plaintiff alleged low back pain that was relieved by ibuprofen.  [R337].  His hypertension was again noted as uncontrolled "due to [Plaintiff] not taking meds," and he was assessed with a probable musculoskeletal strain or sprain.  [R338].

On March 11, 2010, Plaintiff presented at the Grady Ophthalmology Clinic, reporting that his eye pain was 2 out of 10, that his eyes "run water" at night, and that "glare is really bad."  [R335-36, 370-71].  His vision was stable, and he was diagnosed

---

[20]     "Lordosis" refers to the curvature of the lumbar spine.  *PDR Med. Dictionary* 996 (1st ed. 1995).

[21]     Osteophytes are bony outgrowths or protuberances, and "anterior" indicates a position closer to the front of the body.  *PDR Med. Dictionary* 97, 1270 (1st ed. 1995).

14

with optic neuropathy and atrophy, hypertensive retinopathy, dry eyes, and blepharitis.[22]  [R335-36, 370-71].

On May 14, 2010, Plaintiff had a follow-up outpatient visit at Grady.  [R372]. He reported two recent falls but denied dizziness, weakness, or leg pain.  [R 372].  It was also noted that Plaintiff had a normal gait, normal reflexes, and full strength in all extremities.  [R372].

On August 24, 2010, Abraham Oyewo, M.D., an agency reviewing physician, opined that Plaintiff could lift or carry fifty pounds occasionally and twenty-five pounds frequently; could sit, stand, or walk for six hours in an eight-hour workday; and was unlimited in his push/pull ability.  [R358-64].  Dr. Oyewo opined that Plaintiff should avoid exposure to hazards, such as machinery or heights, but found no postural, manipulative, visual, or communicative limitations.  [R359-62].

In September and October 2010, Plaintiff visited Grady with complaints of back, shoulder, and knee pain.  [R365, 380].  Plaintiff's hypertension was found to be uncontrolled due to non-compliance, and his degenerative disc disease was categorized as "minimal."  [R381].

---

[22]    "Blepharitis" refers to inflammation of the eyelids.  *PDR Med. Dictionary* 211 (1st ed. 1995).

15

On January 25, 2011, a physician at the Grady Eye Clinic[23] opined that Plaintiff suffers from bilateral ischemic[24] optic neuropathy evidenced by pale nerves in both eyes.  [R375].  The doctor opined that Plaintiff had effectively lost vision in his left eye and that it would not improve.  [R376].  The doctor further stated that Plaintiff's impairment would not cause headaches, eye fatigue, double vision, or require Plaintiff to rest his eyes frequently.  [R377].  The doctor did, however, opine that Plaintiff would have difficulty reading print less than 20/40; may experience a loss of depth perception or have tunnel or gun-barrel vision; and would have difficulty concentrating his vision on an object for a period of two hours.  [R377].  The doctor also stated that Plaintiff's eyes were likely to water excessively and that he would have to apply eye drops four to five times per day.  [R378].

### D.    *Vocational Expert Testimony*

At Plaintiff's hearing, the ALJ asked a vocational expert ("VE") to consider the occupational capacity of an individual with "the claimant's same age, education, past

---

[23]    The signature on the form is illegible, and no legible representation of the name appears elsewhere in the eye clinic records; the physician's name, specialty, and treating relationship with Plaintiff is therefore unknown.  [*See* R378].

[24]    Ischemia is local anemia caused by diminished blood supply.  *PDR Med. Dictionary* 894 (1st ed. 1995).

16

relevant work experience"; the residual functional capacity ("RFC") to lift and/or carry twenty-five pounds frequently and fifty pounds occasionally, stand and/or walk and sit with normal breaks for a total of six hours out of an eight-hour day, and do unlimited pushing and/or pulling; and the need to "avoid concentrated exposure to hazards such as machinery and heights."  [R63].  The VE testified that such a person could perform medium jobs, such as cleaner II, dining room attendant, and production helper. [R63-64].  The VE further testified that if the individual lacked fine visual acuity, the person could not work as a production helper but could work as a grocery bagger. [R65].

## III.   ALJ'S FINDINGS

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2009.

2.   The claimant has not engaged in substantial gainful activity since March 1, 2007, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.   The claimant has the following severe impairments: hypertension, degenerative joint disease, bilateral ischemic optic neuropathy (worse in the left eye with a resulting visual acuity of 20/40 in the left eye[)], and asthma.  (20 CFR 404.1520(c) and 416.920(c)).

. . .

17

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

. . .

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except for the following limitations: the claimant must avoid concentrated exposure [to] hazards including machinery and heights.

. . .

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

. . .

7.      The claimant was born on March 15, 1960 and was 46 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

18

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

. . .

11.     The claimant has not been under a disability as defined in the Social Security Act from March 1, 2007, through the date of the decision (20 CFR 404.1520(g) and 416.920(g)).

[R21-26].

The ALJ explained that she found Plaintiff's medically determinable mental impairment of depression not to cause more than minimal limitation in Plaintiff's ability to perform basic mental work activities and therefore to be non-severe. [R22]. She noted that the initial assessment conducted by DeKalb County on May 15, 2009, revealed that Plaintiff had moderate anxiety, depression, and substance abuse; his appearance, emotions, thought process, and though content were all within normal limits; he was noted to have hypersomnia; he denied suicidal thoughts or threats of violence; no clinical actions were taken; and Plaintiff was referred to a day program for individual and group counseling. [R22 [citing R271-83]]. The ALJ also noted that no other mental health records were included in the medical evidence of record. [R22].

19

The ALJ also explained that she found Plaintiff's complaints of blurry vision to comport with the ability to perform medium-exertional work except such work involving concentrated exposure to hazards including machinery and heights. [R23-25]. She noted that optic atrophy was found in January 2007, [R229]; an MRI conducted in February 2007 revealed mild chronic microangiopathic change in the periventricular white matter and unremarkable orbits, [R236]; by March 2008, Plaintiff's eye condition had been termed "optic neuropathy," [R242]; an August 4, 2009, ophthalmology clinic note indicated that Plaintiff's neuropathy was intermittent in nature with a throbbing pain, [R327]; March 11, 2010, ophthalmology notes indicated that Plaintiff complained of late-night eye watering with burning and glare and rated his pain a 2/10, his vision was deemed stable, and he was advised to return in six months, [R335-36]; a vision questionnaire dated January 25, 2011, indicated that Plaintiff had bilateral ischemic optic neuropathy, had lost vision from the left eye due to the condition, may have trouble focusing for periods greater than two hours, and requires drops four to five times per day, and that his eyes may water excessively, [R375-78]. [R23-24]. The ALJ stated that because Dr. Oyewo had thoroughly reviewed Plaintiff's medical evidence, she gave substantial weight to Dr. Oyewo's opinion of August 24, 2010, that Plaintiff's allegations of blurry vision

AO 72A
(Rev.8/8
2)

were fully credible and compatible with medium work limited by the requirement to avoid exposure to hazards including machinery and heights.  [R25].  The ALJ stated that she gave less weight to the opinions stated in the vision questionnaire because it included only opinions with no diagnostics or explanations of Plaintiff's eye condition, and she also stated that she had given consideration to the treatment notes.  [R25].

## IV.   STANDARD FOR DETERMINING DISABILITY

An individual is considered disabled for purposes of disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).   The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner. The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a). The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). The claimant must prove at step one that he is not undertaking substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the claimant must prove that he is suffering from a severe impairment or combination of impairments that significantly limits his ability to perform basic work-related activities. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). At step four, if the claimant is unable to prove the existence of a listed impairment, he must prove that his impairment prevents performance of past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). At step five,

22

the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can perform other work besides past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform. *Doughty*, 245 F.3d at 1278 n.2. To be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists. *Id.*

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that he is unable to engage in any substantial gainful activity that exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2; *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983), *superceded by statute on other grounds by* 42 U.S.C. § 423(d)(5), *as recognized in Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1214 (11th Cir. 1991).

## V.   SCOPE OF JUDICIAL REVIEW

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner. Judicial review of the administrative decision addresses three

23

questions:  (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues.  *Washington v. Astrue*, 558 F. Supp. 2d 1287, 1296 (N.D. Ga. 2008); *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980).  This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).  If substantial evidence supports the Commissioner's factual findings and the Commissioner applies the proper legal standards, the Commissioner's findings are conclusive.  *Lewis v. Callahan*, 125 F.3d1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986)  (per curiam); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"Substantial evidence" means "more than a scintilla, but less than a preponderance."  *Bloodsworth*, 703 F.2d at 1239.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and it must be enough to justify a refusal to direct a verdict were the case before a jury.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*,

703 F.2d at 1239.  "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision."  *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam).  Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision.  *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991).  In contrast, review of the ALJ's application of legal principles is plenary.  *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

## VI.   CLAIMS OF ERROR

### A.     *Arguments*

Plaintiff argues that the ALJ erred by failing to evaluate and develop the record regarding Plaintiff's mental and visual impairments.   [Doc. 11 at 1-2, 6, 9]. Specifically, Plaintiff points out that although the ALJ discussed the May 15, 2009, mental evaluation conducted by DeKalb County, she did not expressly acknowledge the GAF score of 40 or re-contact DeKalb County to make further inquiry, and Plaintiff argues that the ALJ erred by failing to order a consultative mental examination or to explain why she did not order a consultative mental examination.  [*Id*. at 8].  He

25

suggests that the failure to develop the record of Plaintiff's mental impairments led the ALJ to improperly evaluate Plaintiff's credibility and arrive at an erroneous RFC finding.  [*Id*. at 1, 6, 8-12].  Plaintiff further argues that the RFC is incomplete because it does not make any "specific functional findings and fails to make accommodations for Plaintiff's vision problems."  [*Id*. at 9].  Last, Plaintiff contends that because the RFC was erroneous, the testimony the ALJ elicited from the VE was insufficient to provide substantial evidence for the disability denial.  [*Id*. at 2, 12-14].  For these reasons, Plaintiff contends that he did not receive a "full and fair hearing."  [*Id*. at 10].

The Commissioner, in response, argues that the ALJ fully developed the record with respect to Plaintiff's mental impairments, the RFC and credibility determinations were supported by substantial evidence, and the ALJ properly relied on the VE's testimony.  [Doc. 12 at 12-24].  With regard to the alleged mental impairments, the Commissioner argues that GAF scores are not findings regarding a claimant's ability to work and therefore need not have been expressly considered, [*id*. at n.16]; the GAF score was also due no deference because the counselor who made the GAF determination was not an acceptable medical source, [*id*. at n.12]; Plaintiff has failed to show why a consultative mental examination was necessary, [*id*. at 13-14]; the DeKalb County report contained sufficient evidence to make an informed decision as

26

to Plaintiff's mental limitations and was neither ambiguous nor unclear, and therefore, no reason for re-contact arose, [*id*. at 14-15]; and Plaintiff is merely speculating that re-contact would support, rather than undermine, his disability claim, [*id*. at 15]; and the record contains sufficient evidence to make an informed decision with respect to Plaintiff's impairments and to support the mental RFC, [*id*. at 12-13, 15-18].  The Commissioner contends that Plaintiff's other complaints about the RFC are unavailing because the RFC precludes work involving concentrated exposure to hazards, including machinery and heights, and therefore sufficiently accommodates Plaintiff's visual limitations; Plaintiff failed to develop his argument that a functional analysis was required; and, in any event, Plaintiff's functional limitations were implicit in the ALJ's reference to the limited range of "medium work."  [*Id*. at 16, 18-19 & n.15].  The Commissioner also argues that the ALJ provided substantial evidence for her credibility determination, [*id*. at 20-22], and that because the ALJ properly applied the law and substantial evidence supports the RFC, the ALJ proposed a valid hypothetical and properly relied on the VE's testimony, [*id*. at 23-24].

AO 72A
(Rev.8/8
2)

**B.      Discussion**

**1.      *Adequacy of Record Regarding Mental Impairments***

Plaintiff points out that the ALJ did not expressly acknowledge the GAF score of 40 found during the DeKalb County mental evaluation dated May 15, 2009, or re-contact DeKalb County to make further inquiry about the mental evaluation, and he argues that the ALJ erred by failing to order a consultative mental examination or to explain why she did not order a consultative mental examination.  The Court first considers whether the ALJ's failure to discuss the GAF score alone constituted reversible error and then considers whether re-contact or a consultative mental examination was necessary.

**a.      *GAF Score***

Plaintiff points out that the ALJ did not expressly acknowledge his GAF score of 40 but does not state whether he contends that this constituted error or explain why it may have been error.  [*See* Doc. 11 at 6-8 & n.3].  In the response brief, the Commissioner notes that merely mentioning an issue is insufficient to raise it upon appeal.  [Doc. 12 at 17 n.15 (citing *Rowe v. Schreiber*, 139 F.3d 1381, 1382 n.1 (11th Cir. 1998) (holding that because the plaintiff merely mentioned that the defendant violated certain of his civil rights and failed to develop arguments to support his

28

position, those issues were deemed abandoned on appeal); *N.L.R.B. v. McClain of Ga., Inc.*, 138 F.3d 1418, 1422 (11th Cir. 1998) ("Issues raised in a perfunctory manner, without supporting arguments and citation to authorities, are generally deemed to be waived."))].  The Commissioner also contends that the ALJ did not err in failing to expressly address the GAF score in the opinion because GAF scores do not constitute a specific finding regarding a claimant's ability to work, but instead refer to a global scale used in the treatment of an ongoing condition, [Doc. 12 at 17 n.16 (citing *Wind v. Barnhart*, 133 Fed. Appx. 684, 692 n.5 (11th Cir. June 2, 2005) (per curiam))], and moreover, that in this case, the counselor who assigned the score was not an acceptable medical source and therefore cannot establish the existence of an impairment, [Doc. 12 at 13 n.12 (citing 20 C.F.R. §§ 404.1513(a), (d)(1), 404.1527(a)(2), 416.913(a), (d)(1), 416.927(a)(2))].

After carefully considering Plaintiff's brief, the Court finds no basis upon which to presume that Plaintiff does in fact intend to argue that the ALJ erred by failing to expressly discuss the GAF score appearing in the DeKalb County assessment. [*See* Doc. 11 at 8].  Rather, it appears that Plaintiff simply intends to assert that the GAF score is evidence of a disabling mental impairment and that it therefore should have triggered the ALJ to order a consultative mental examination.  [*See id.*].  Thus, the

29

Court finds that Plaintiff has failed to raise any argument that the lack of a discussion of the GAF score constituted reversible error, and the issue is therefore not properly before the Court. *See Outlaw v. Barnhart*, 197 Fed. Appx. 825, 827 n.3 (11th Cir. Aug. 10, 2006) (per curiam) (finding that the plaintiff waived an issue by failing to elaborate on the argument or provide a citation to authority regarding the argument).

Furthermore, even if Plaintiff did intend argue that the ALJ erred by omitting any discussion of the GAF score, the Court finds no reversible error in the omission.  First, the Commissioner is correct that a GAF score does not translate into a specific finding regarding functional limitations.  *See Wind*, 133 Fed. Appx. at 692 n.5 (noting that the Commissioner has declined to endorse the GAF scale because the scores have no direct correlation to the severity requirements of the mental disorder listings); Revised Med Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000) ("The GAF scale . . . does not have a direct correlation to the severity requirements in our mental disorders listings."); *see also Kornecky v. Comm'r Soc. Sec.*, 167 Fed. Appx. 496, 511 (6th Cir. Feb. 6, 2006) (per curiam) (rejecting claimant's argument that GAF scores of 46 and 40-45 noted by a doctor and a case manager required a disability finding); *Seymore v. Apfel*,

131 F.3d 152 (10th Cir. Dec. 8, 1997) (unpublished table opinion) ("Contrary to claimant's contention, a GAF rating of 45 may indicate problems that do not necessarily relate to the ability to hold a job; thus, standing alone without further narrative explanation, the rating of 45 does not evidence an impairment seriously interfering with claimant's ability to work."); *Ward v. Astrue*, No. 3:00-CV-1137-J-HTS, 2008 WL 1994978, at *3 (M.D. Fla. May 8, 2008) ("[A]n opinion concerning GAF, even if required to be accepted as valid, would not translate into a specific finding in regard to functional limitations."); *Quaite v. Barnhart*, 312 F. Supp. 2d 1195, 1200 (E.D. Mo. 2004) ("In the absence of any evidence indicating that [the consultative psychological examiner] assigned this GAF score [50] because he perceived an impairment in plaintiff's ability to work, the score, standing alone, does not establish an impairment seriously interfering with plaintiff's ability to perform basic work activities."). Therefore, the GAF score of 40, standing alone, did not constitute evidence of disability.

Second, the Court also agrees with the Commissioner that because the GAF was assigned by a counselor, [*see* R271-83 (indicating that the assessment was made by Cherrell Thomas, LAPC)], and not "an acceptable medical source," it is not entitled to any special consideration. *See Johnson v. Apfel*, No. CIV. A. 98–0674–AH–G,

31

2000 WL 208741, at *3 (S.D. Ala. Feb. 17, 2000) (holding that a licensed professional counselor is not an acceptable medical source under 20 C.F.R. § 416.913(a), and therefore a report made by such a counselor is not entitled to weight afforded an acceptable medical source) (citing *Gomez v. Chater*, 74 F.3d 967, 970-71 (9th Cir. 1996) (holding that a nurse practitioner working without the supervision of a physician does not constitute an acceptable medical source)).

Third, even if the GAF had been issued by a treating physician, there is no "rigid requirement" that the ALJ refer to it so long as the ALJ's decision is sufficient to allow the reviewing court to determine that the ALJ considered the claimant's medical condition as a whole. *Newsome ex rel. Bell v. Barnhart*, 444 F. Supp. 2d 1195, 1198-1200 (M.D. Ala. 2006); *see also Ogranaja v. Comm'r of Soc. Sec.*, 186 Fed. Appx. 848, 851 (11th Cir. June 5, 2006) ("We do not require the ALJ to 'specifically refer to every piece of evidence in his decision,' so long as the decision is sufficient to allow us to conclude that the ALJ considered the claimant's medical condition as a whole.") (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005)).

The ALJ's opinion makes clear that she considered Plaintiff's medical condition as a whole. Although Plaintiff makes much of the GAF score, the record shows that

32

Plaintiff was assigned a GAF only once, on May 15, 2009, in what appears to be Ms. Thomas's first encounter with him.  [*See* R280 (stating that Plaintiff would begin treatment at the facility on May 19, 2009)].  As the ALJ noted, the narrative contained in Ms. Thomas's report indicated "moderate" anxiety, depression, and substance abuse; "normal" appearance, emotions, thought process, and thought content; and conservative treatment—no clinical actions were taken, and Plaintiff was referred to a day program for individual and group counseling.  [R22].  Additionally, Ms. Thomas's assessment noted only "vague" symptoms of depression of a duration of between thirty days and six months but found a long and continuing history of substance abuse and assigned Plaintiff to "Addictions Day Treatment."  [R280].  As the ALJ also noted, by the time of the hearing, Plaintiff had abstained from substance abuse for more than one year; was capable of caring for an older friend by cleaning his bathroom and kitchen and accompanying him to dialysis; and was capable of taking public transportation to see his friend.  [R22, 24].  The ALJ also noted that there were no other mental health records.  [R22].

Given the ALJ's discussion of the narrative and treatment recommendations contained in Ms. Thomas's report, the ALJ's finding that Plaintiff had since abstained from substance abuse, the ALJ's note that there were no other mental treatment records,

33

and the ALJ's discussion of Plaintiff's activities of daily living at the time of the hearing, it is clear that the ALJ considered the record as a whole and reasonably determined that Plaintiff did not suffer from disabling mental impairments.  Thus, the Court finds that the ALJ did not err in omitting discussion of the GAF score.

>    **b.    Need to Re-contact DeKalb County or Procure a Consultative Mental Examination**

Plaintiff raises the issue of re-contact in much the same manner as he raised the GAF-score issue:  he points out that the ALJ did not re-contact DeKalb County regarding the initial assessment but does not state whether he contends that this constituted error, nor does he explain why it may have been error.  [*See* Doc. 11 at 8]. He does, however, contend that by failing to order a consultative mental examination, the ALJ failed to meet her "basic obligation to develop a full and fair record."  [*Id.* at 7 (quoting *Newton v. Astrue*, 297 Fed. Appx. 880, 883 (11th Cir. Oct. 23, 2008) (per curiam); *Welch v. Bowen*, 854 F.2d 436, 440 (11th Cir. 1998) (per curiam))].  He points out that under the regulations, the ALJ may order a consultative examination if the evidence as a whole is insufficient to make a decision; the additional evidence needed is not contained in the medical sources' records; highly technical or specialized medical evidence is needed and not available from another source; an inconsistency in

34

the evidence must be resolved; or there is a change in the claimant's condition that is likely to affect his ability to work, and the current severity of the impairment is not established. [Doc. 11 at 7-8 (citing 20 C.F.R. §§ 416.917, 416.919a(b))]. He then generally implies that he was prejudiced by the ALJ's failure to order a consultative mental examination. [*See* Doc. 11 at 8].

In response, the Commissioner argues that the record contains sufficient evidence to make an informed decision with respect to Plaintiff's mental impairments and to support the mental RFC, and thus, there was no need to re-contact DeKalb County or order a consultative examination. [Doc. 12 at 12-23 (citing *Graham v. Apfel*, 129 F.3d 1420, 1423 (11th Cir. 1997) (finding that "the record was sufficient for the ALJ to evaluate [the plaintiff's] impairments and functional ability" and therefore did not show "the kind of gaps in the evidence necessary to demonstrate prejudice")]. Specifically, the Commissioner points out that Plaintiff was examined for his mental health only once, and while he was diagnosed with depression, his symptoms were noted to be "vague," [Doc. at 12-13 [citing R22, 271-83]]; although Plaintiff visited the hospital many times from 2006 through 2011 for his other impairments, treatment notes from those visits do not contain a diagnosis of depression or any concerns about Plaintiff's mental state, nor do they assess any mental limitations, [Doc. 12 at 13

35

[citing R57, 212-84, 302-49, 365-73, 380-402]]; and Plaintiff stated at his hearing that the only impairments limiting his ability to work were his hypertension, leg pain, and blurred vision, [Doc. 12 at 13 [citing R38-39]].  The Commissioner further argues that there was no reason to re-contact DeKalb County because the assessment contained sufficient evidence to make an informed decision as to Plaintiff's mental limitations and was neither ambiguous nor unclear, [Doc. 12 at 14-15 (citing *Shaw v. Astrue*, 392 Fed. Appx. 684, 688-89 (11th Cir. Aug. 12, 2010) (per curiam) (re-contacting a medical source is proper where the ALJ cannot ascertain the basis for the source's opinion); *Gallina v. Comm'r of Soc. Sec.*, 202 Fed. Appx. 387, 388 (11th Cir. Oct. 25, 2006) (per curiam) ("[M]edical sources generally need only be re-contacted when the evidence received from that source is inadequate to determine whether the claimant is disabled."); 20 C.F.R. §§ 404.1512(e), 416.912(e))]; Plaintiff has failed to justify any request to remand the case for re-contact because he is merely speculating that re-contact would support, rather than undermine, his disability claim, [Doc. 12 at 15 (citing *Moore v. Barnhart*, 405 F.3d 1208, 1213 (11th Cir. 2005) (finding that where the ALJ's RFC determination is supported by substantial evidence, a plaintiff must point to medical evidence that conflicts with the determination, and that it is insufficient to "argue[] inferentially that based on their evaluations, [the plaintiff's]

AO 72A
(Rev.8/8
2)

physicians *would most likely* disagree with the ALJ's findings"))]; and Plaintiff has failed to show why a consultative mental examination was necessary, [Doc. 12 at 13-14 (citing *Holladay v. Bowen*, 848 F.2d 1206, 1210 (11th Cir. 1988) (An ALJ "is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the administrative law judge to render a decision."); 20 C.F.R. §§ 404.1517, 404.1519a, 416.917, 416.919a)].

In this case, the undersigned concludes that the ALJ did not err in failing to re-contact Ms. Thomas or order a consultative examination and that the record contained substantial evidence to support the ALJ's determination that Plaintiff did not suffer from disabling mental impairments. Re-contact was unnecessary for at least two reasons. First, the ALJ was not required to re-contact Ms. Thomas because, as discussed above, Ms. Thomas was a licensed professional counselor and not "an acceptable medical source," and therefore the duty to re-contact did not apply. *See Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) (providing that the re-contact provision set forth in 20 C.F.R. § 404.1512(e) (1997) applied only to a treating source). Second, the report presented no inconsistencies to resolve because, as discussed above, a GAF score alone does not constitute evidence of disability, and the remainder of Ms. Thomas's assessment supported the ALJ's determination that Plaintiff

37

did not suffer from disabling depression:  Ms. Thomas described Plaintiff's depression as "moderate" and of a duration of "between 30 days and 6 months," [R271, 281]; stated that Plaintiff was "vague" about his depressive symptoms, [R280]; and listed the diagnosis of depressive disorder, not otherwise specified, as a tertiary diagnosis.[25] [R278].

The Court also finds nothing in the record to suggest that the ALJ should have ordered a consultative mental examination.  "[T]he ALJ has a duty to develop the record fully and fairly." *Wilson v. Apfel*, 179 F.3d 1276, 1278 (11th Cir. 1999); *see also* 20 C.F.R. § 416.912(d).  The Commissioner may order a consultative examination if a plaintiff's medical sources cannot or will not give the Commissioner sufficient medical evidence about an impairment to allow a disability determination. 20 C.F.R. § 416.917.  In making this decision, the Commissioner considers the medical reports, the disability interview form, and other pertinent evidence. *Id.* § 416.919a(a)(1).  A case will be remanded for failure to develop the record only if the plaintiff shows prejudice.  *See Robinson v. Astrue*, 365 Fed. Appx. 993, 995-96

---

[25]    According to the DSM-IV, the principal diagnosis or reason for visit should be listed first, with the other disorders following.  DSM-IV-TR at 27-28, 35. Here, the primary diagnosis was continuous cocaine abuse, and the secondary diagnosis was continuous cannabis abuse, [R278]—both of which the ALJ determined had ceased more than a year before the hearing, [R22].

(11th Cir.  Feb. 19. 2010) (citing *Brown v. Shalala*, 44 F.3d 931, 935 (11th Cir. 1995)).

Prejudice "at least requires a showing that the ALJ did not have all of the relevant

evidence before [her] in the record . . . or that the ALJ did not consider all of the

evidence in the record." *Kelley v. Heckler*, 761 F.2d 1538, 1540 (11th Cir. 1985).

It is Plaintiff's burden, not the Commissioner's, to establish a disability.  *See*

*Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1269 (11th Cir. 2007) (holding

that the ALJ did not err by failing to inquire into the claimant's mental capacity because

"[e]ven though Social Security courts are inquisitorial, not adversarial, in nature,

claimants must establish that they are eligible for benefits."); *Doughty*,

245 F.3d at 1281 (holding that the ALJ is not required to order a consultative

examination as long as the record contains sufficient evidence for an informed

decision); 20 C.F.R. § 416.912(a).  To be disabled, a plaintiff must establish that he has

medically determinable impairments through medical evidence.  *See id.* § 416.912(c).

Therefore, Plaintiff had the burden of establishing an impairment that would cause

behavioral or cognitive limitations.  *See id.*  (placing burden on claimant to show how

the impairment affects functioning).

Plaintiff did not meet this burden.  Plaintiff did not allege that he was *disabled by*

a mental impairment, even if he did have a "medically determinable mental impairment

AO 72A
(Rev.8/8
2)

of depression," in the words of the ALJ.  [R22, R163 (adult disability report alleging that Plaintiff was limited in his ability to work by high blood pressure, leg pain, and blurred vision); R38-39 (Plaintiff's testimony that his disability application arose from his hypertension, leg pain, and blurred vision and nothing else)].  Plaintiff also testified during the hearing that he had not had depression treatment and had not taken any medication for it.  [R56-58].  Moreover, Ms. Thomas, the certified counselor, considered the degree of Plaintiff's depression and found that it was moderate and of a duration of thirty days to six months, and recommended that Plaintiff undergo treatment for substance abuse but made no provision or recommendation for treatment for depression.  [R271-83].  Additionally, although the medical evidence shows that Plaintiff frequently received medical treatment, it is devoid of any indication that Plaintiff was treated for depression or referred for such treatment or that depression was a concern of any of his physicians.  *See Manzo v. Comm'r of Soc. Sec.*, 408 Fed. Appx. 265, 269 (11th Cir. Jan. 7, 2011) (affirming decision that plaintiff failed to carry her burden of establishing that anxiety constituted a severe mental impairment where ALJ noted that plaintiff had never been referred for mental health treatment).

For all of these reasons, the Court concludes that the ALJ did not err in failing to order a consultative mental evaluation or in determining that Plaintiff did not suffer from disabling depression.

### 2. *The RFC's Functional Limitations and Vision Accommodations*

Plaintiff next argues that the RFC is incomplete because it does not make any "specific functional findings and fails to make accommodations for Plaintiff's vision problems." [Doc. at 9 (quoting *Felton v. Astrue*, No. 1:11-CV-3517-TWT-ECS, 2013 WL 870440, at *10 (N.D. Ga. Feb. 6, 2013) (Scofield, M.J.) ("The ALJ's RFC assessment must also 'describe[ ] how the evidence supports each conclusion' and 'explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.' ") (quoting Social Security Regulation ("SSR") 96-8p), *adopted at* 2013 WL 870315 (N.D. Ga. Mar. 7, 2013) (Thrash, J.); *Washington v. Astrue*, 558 F. Supp. 2d 1287, 1300 (N.D. Ga. 2008) (Baverman, M.J.) ("The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis . . . .  Only after that may the RFC assessment be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy.") (quoting SSR 96-8p))].  The Commissioner, in response, points out that Plaintiff has

41

failed to develop his argument that the ALJ's functional findings were lacking and contends that there was no need for the ALJ to itemize Plaintiff's functional limitations because they were implicit in the ALJ's reference to "medium work." [Doc. 12 at 18-19 & n.15 (citing *Castel v. Comm'r of Soc. Sec.*, 355 Fed. Appx. 260, 263 (11th Cir. Nov. 30, 2009) (per curiam))].  The Commissioner further argues that because the RFC precludes work involving concentrated exposure to hazards, including machinery and heights, it therefore sufficiently accommodates Plaintiff's visual limitations.  [Doc. 12 at 18-19].

### a.       Function-by-Function Analysis

The Court finds no reversible error in the ALJ's determination of Plaintiff's ability to handle the strength demands set forth in the RFC.  As the Commissioner points out, Plaintiff merely raises the issue of whether the ALJ performed a proper function-by-function analysis and presents no argument to support his allegation that the ALJ failed to do so.  For this reason alone, the Court could affirm this aspect of the ALJ's opinion.

Plaintiff's allegation also fails on the merits.   In determining Plaintiff's functional capabilities, the ALJ considered Plaintiff's testimony, his activities of daily living, the medical records, the vision questionnaire, the consultative examination

42

report provided by Dr. Sanford, and the physical residual functional capacity assessment provided by Dr. Oyewo, and she ultimately decided that Plaintiff was capable of performing medium-exertion work, except such work involving concentrated exposure to work hazards such as machinery and heights. [R23-25]. *See Castel*, 355 Fed. Appx. at 263 (citing SSR 96-8p for its provision that the RFC assessment must consider all relevant evidence, including medical history, medical evaluations, daily activities, and lay evidence). "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c), 416.967(c). It also requires the "ability to stand or walk, off and on, for a total of approximately six hours in an eight-hour workday; use of the arms and hands to grasp, hold and turn objects; and frequent bending/stooping." *Coleman v. Barnhart*, 264 F. Supp. 2d 1007, 1010 (S.D. Ala. 2003) (citing SSR 83-10).

Dr. Sanford's June 10, 2009, consultative examination indicates that while Plaintiff complained of right-leg pain, he also reported that he had no difficulties walking and that walking relieved his pain. [R287]. Dr. Sanford also noted that Plaintiff's descriptions of his medical history were "vague." [R287]. He found that Plaintiff had a normal respiratory pattern with no deviations or chest wall

43

abnormalities.  [R288].  His heart rate was normal with no gallop or murmur.  [R288].

Extremities were unremarkable and joints showed no warmth, swelling, or deformity.

[R288].  His back showed no spasm or swelling, his gait was normal, and he had no

difficulty getting on and off the examination table.  [R288].  He was neurologically

intact, and there was no evidence of mental problems.  [R288-89].  Dr. Sanford also

observed a normal range of motion and strength in all available categories.  [R289-92].

A lumbar-spine x-ray series conducted later that year revealed "minimal" degenerative

disease.  [R340].  On August 24, 2010, Dr. Oyewo opined based on his review of

Plaintiff's medical records that Plaintiff could lift or carry fifty pounds occasionally and

twenty-five pounds frequently; could sit, stand, or walk for six hours in an eight-hour

workday; and was unlimited in his push/pull ability.  [R358-64].  Plaintiff also testified

that he took public transportation and cooked and cleaned for an elderly friend.  [R47-

51].

　　　　Plaintiff does not assert that the ALJ failed to consider any evidence regarding

his exertional limitations, [*see* Doc. 11, *passim*], and the Court finds the above to be

substantial evidence supporting the ALJ's determination that Plaintiff retained the

ability to perform work at the medium exertional level.  Consequently, the Court

concludes that the ALJ performed a proper RFC function analysis.

AO 72A
(Rev.8/8
2)

### b.    *Accommodation for Visual Limitations*

Plaintiff also asserts that the RFC is incomplete because it fails to make accommodations for Plaintiff's vision problems.   [Doc. 11 at 9-10].  In response, the Commissioner argues that at step two, the ALJ found that Plaintiff had the severe impairment of bilateral ischemic optic neuropathy resulting in visual acuity of 20/40 in the left eye, [R21], and accordingly crafted the RFC to exclude work involving concentrated exposure to hazards, including machinery and heights, [R23]. [Doc. 12 at 18].  The Commissioner also points out that Plaintiff has failed to show that his impairments resulted in any limitation in excess of the RFC and asserts that RFC is supported by substantial evidence.  [*Id*. at 19 (citing *Moore*, 405 F.3d at 1213 (providing that even if the record could support a different RFC, an RFC supported by substantial evidence will not be disturbed); *Graham v. Bowen*, 790 F.2d 1572, 1575 (11th Cir. 1986) ("The weighing of evidence is a function of the factfinder, not of the district court."))].

The Court finds that there is substantial evidence showing that the RFC accommodated Plaintiff's vision problems.  The ALJ explained that in crafting the RFC, she considered Plaintiff's allegations that he suffers from blurred vision occasionally and that he applies eye drops four times per day.  [R23].  She further

45

reviewed the medical records from the Grady Eye Clinic, which detailed Plaintiff's complaints of blurriness, wateriness, glare, and intermittent eye pain, and she also reviewed the January 2011 questionnaire, which diagnosed bilateral ischemic optic neuropathy, stated that Plaintiff had lost vision from his left eye, may have trouble focusing for periods of greater than two hours, and requires drops four to five times per day, and that his eyes may water excessively. [R24]. She also explained that she gave substantial weight to Dr. Oyewo's opinion that Plaintiff's allegations of blurry vision were fully credible, [R25], and she adopted the environmental limitation stated in Dr. Oyewo's opinion, [*compare* R23 *with* R361].

Furthermore, the Court finds that even if the RFC stated in the ALJ's decision did fail to fully accommodate Plaintiff's vision problems, the record developed by the ALJ at the hearing demonstrates that the error was harmless. In response to the ALJ's questioning, the VE testified that a person with the RFC articulated in the ALJ's decision could perform jobs occurring in substantial numbers in the national and local economy, such as cleaner, dining room attendant, and production helper. [R63-64]. The ALJ then went on to ask the VE about the vocational abilities of a person with that RFC and who additionally had "no fine visual acuity." [R64-65]. The VE responded that the modification would preclude the person from working as a production helper

46

(approximately 800 jobs in Georgia and 28,000 nationally) but that the person would be able to work as a grocery bagger (approximately 1,110 jobs in Georgia and 40,000 nationally). [R64-65]. Plaintiff's attorney conceded at the hearing that even the visual questionnaire could not be construed to assert any visual limitation more restrictive than "blurred vision." [R67-69]. Thus, the Court finds that in eliciting testimony from the VE showing that jobs existed in substantial numbers in the national and local economy even for a person with an RFC of medium work, with no exposure to workplace hazards, and the additional limitation of no fine visual acuity, the ALJ demonstrated that Plaintiff's vision problems were not disabling.

### 3.    Credibility

Plaintiff also argues that the ALJ's credibility assessment is not supported by substantial evidence. [Doc. 11 at 10-12]. He points to the ALJ's finding that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms but that his statements concerning the intensity, persistence, and limiting effects of the symptoms were "not credible to the extent they are inconsistent with the . . . residual functional capacity assessment." [*Id*. at 10 [citing R24]]. He cites a couple of unpublished district-court cases from another circuit, which Plaintiff appears to suggest provide that such a finding is *per se* reversible error. [Doc. 11 at 10-11]. He

47

also argues that in making her credibility determination, the ALJ was required to consider the factors set out in SSR 96-7p[14] and discuss at least some of them but that she failed to do so, [*id*. at 11], and he further asserts that the ALJ erred by failing to specify exactly which portions of Plaintiff's testimony were not credible, [*id*. at 12].

The Court is not aware of any requirement that an ALJ affirmatively enumerate each portion of the claimant's testimony she finds incredible, and Plaintiff does not supply any authority in support of this theory. The Court therefore finds this portion of Plaintiff's credibility appeal to be without merit.

It is true, however, that where an ALJ decides not to credit a claimant's testimony regarding subjective allegations of disability, she must articulate explicit and adequate reasons for doing so. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). Be that as it may, in rejecting such testimony, the ALJ does not need to refer

---

[14]     SSR 96-7p provides, in relevant part, that when making a credibility determination, the ALJ must consider the objective medical evidence as well as (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate the symptoms; (5) other treatment the claimant receives or has received for relief of the symptoms; (6) non-treatment measures the claimant uses or has used to relieve the symptoms ("e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board"); and (7) any other factors concerning the claimant's functional limitations and restrictions due to the symptoms. SSR 96-7p.

AO 72A
(Rev.8/8
2)

specifically to each piece of evidence in her decision, so long as the decision "is not a broad rejection" that does not allow the reviewing court to determine that the ALJ considered the claimant's medical condition as a whole. *Dyer*, 395 F.3d at 1211.

Here, the ALJ did not simply issue a broad rejection of Plaintiff's testimony regarding the subjective effects of his symptoms but instead, she considered Plaintiff's overall medical condition and placed on the record explicit reasons for rejecting his testimony and finding that his impairments were not severe enough to be disabling. *See* 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4) (providing that in evaluating subjective complaints, the ALJ must "consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence"). Specifically, the ALJ noted Plaintiff's testimony that he was able to help an elderly friend by cleaning his bathroom and kitchen and that he was able to use public transportation. [R24-25]. She also noted that the treatment Plaintiff had received for the allegedly disabling impairments had been "essentially routine and conservative in nature" and that Plaintiff had been noncompliant in taking prescribed medications, which suggested that the symptoms may not have been as limited as Plaintiff alleged. [R24-25]. The ALJ also explained that she gave substantial weight to Dr. Oyewo's opinion because he had thoroughly

49

reviewed the medical records; gave some weight to Dr. Sanford's opinion because its specificity and reliability was undermined by Plaintiff's "vague" descriptions; and gave lesser weight to the vision questionnaire because it included only opinions and no diagnostics or explanations of Plaintiff's eye condition. [R25]. She also stated that she had considered the treatment notes appearing in the record, including the lumbar x-rays showing minimal degeneration and chest x-rays showing no gross abnormalities. [R24-25]. Thus, the Court finds that the ALJ's credibility determination was not an impermissibly broad rejection of Plaintiff's testimony, as Plaintiff seems to suggest, but was instead a detailed, generally well-reasoned explanation. *See Dyer*, 395 F.3d at 1210-11; *Holt*, 921 F.2d at 1223; SSR 96-7p. Consequently, the ALJ's credibility analysis provides no grounds for reversal.

### 4.    *Vocational Testimony*

Plaintiff's argument that the vocational testimony cannot provide substantial evidence to support the denial is predicated on his allegations that his mental and visual impairments imposed limitations greater than those included in the RFC and the hypothetical posed to the VE. [Doc. 11 at 12-13]. Because the Court finds that substantial evidence supports the ALJ's RFC determination and that the hypothetical included all of the limitations contained in the RFC, this argument is also without merit.

AO 72A
(Rev.8/8
2)

## VIII.  CONCLUSION

For the reasons above, the Court **AFFIRMS** the final decision of the Commissioner.

The Clerk is **DIRECTED** to enter final judgment in the Commissioner's favor.

**IT IS SO ORDERED and DIRECTED,** this the 27th day of February, 2014.

_____
ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

51